**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**MIDLAND-ODESSA DIVISION**

| | | |
|---|---|---|
| **CHARLOTTE SAMUELL,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 7:13-cv-00047** |
| | § | |
| **TOYOTA MOTOR CORP., TOYOTA** | § | **JURY** |
| **MOTOR SALES, U.S.A., INC., and** | § | |
| **TOYOTA MOTOR ENGINEERING &** | § | |
| **MANUFACTURING NORTH** | § | |
| **AMERICA, INC.,** | § | |
| | § | |
| **Defendants.** | § | |

**PLAINTIFF CHARLOTTE SAMUELL'S RESPONSE TO TOYOTA'S MOTION FOR
SUMMARY JUDGMENT AND SUPPLEMENT TO ITS MOTION FOR SUMMARY
JUDGMENT**

Charlotte Samuell, Plaintiff, ("Plaintiff") files her Response to Toyota's Motion for Summary Judgment and Supplement to its Summary Judgment, and would respectfully show this Court the following:

## A. Introduction

Plaintiff files this Response to Defendants' Motion for Summary Judgment ("Original Motion") and Supplemental Motion for Summary Judgment ("Supplement") (collectively "MSJ"), and asks the Court to deny Toyota's MSJ in its entirety.

## B. Basis of Defendants' Motion for Summary Judgment

Toyota bases its MSJ almost entirely on the untrue assertion that Plaintiff does not have expert testimony to support her claims. Plaintiff does indeed have an exceptionally qualified expert, Stephen Syson, who has, and will, testify in detail about Toyota's defective design and testing of the 2011 Toyota Camry.

Toyota makes the statement that "…nothing has changed since the Court originally granted Toyota's MSJ." That statement is simply and obviously false. Since September 3, 2014, the Court has permitted the filing of Plaintiff's Response to Toyota's Original Motion, which included the report of Stephen Syson. *See Doc. No. 57.* The Court also permitted Toyota to file a supplement to it motion, and permitted Plaintiff to file an additional response. *Id.*

Since that time, Mr. Syson has supplemented his Report, and has been presented for a full day of deposition. Mr. Syson's Reports, and his testimony, completely eliminate any argument that Toyota could make about the lack of expert testimony to support Plaintiff's case. This case is not susceptible to summary judgment, and deserves to reach the trier of fact.

## C. Exhibits to Plaintiff's Response

The following are the exhibits that are attached to this Response, and incorporated herein:

Exhibit 1: Stephen Syson Expert Report dated July 14, 2014

Exhibit 2: Stephen Syson Expert Report dated November 21, 2014

Exhibit 3: Stephen Syson Affidavit dated January 13, 2015.

Exhibit 4: Stephen Syson Deposition dated December 12, 2014, with select exhibits

Exhibit 5: Toyota Motor Corporation's Response to Plaintiff's Notice of FRCP 30(b)(6) Notice of Deposition of Corporate Representative of Toyota Motor Corporation

Exhibit 6: Toyota Motor Corporation's Response to Plaintiff Charlotte Samuell's Request for Production of Documents

Exhibit 7: Excerpts from Deposition of Charlotte Samuells

Exhibit 8: Excerpts from Deposition of Valerie Hicks

Exhibit 9: Excerpts from Deposition of Timothy Davis

Exhibit 10: Excerpts from Deposition of Stephen Blanco

Exhibit 11: Excerpts from Deposition of Dr. Montgomery

## D. Motion for Summary Judgment Standards

Under Fed. R. Civ. P. 56, "a party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Toyota, the movant, has not and cannot show that there is no genuine dispute as to any material fact.

The initial burden is on Toyota, as the movant, to show the absence of evidence to support the nonmoving party's case. "If the moving party fails to meet its initial burden, the motion must be denied…" *United States v. $92,203.00 in U.S. Currency*, 537 F. 2d 504, 507 (5th Cir. 2008). Toyota has not pointed to any material element of Plaintiff's case that is not supported by evidence. On this ground alone, Toyota's MSJ should be denied.

Even if the court were to determine that Toyota has met its initial burden, which Plaintiff does not believe it has done, Plaintiff is able to provide evidentiary support for each element of her case, and does so through this Response, the materials filed with it, and all other materials in the record. In deciding a summary judgment motion, the court must draw all reasonable inferences in the light most favorable to the non-moving party, and it cannot make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000).

## E. Plaintiff's design defect, marketing defect, negligence, and breach of implied warranty claims are supported by facts and law

Plaintiff designated Stephen Syson, of Syson Corporation, as her expert witness on issues related to the design and crashworthiness of Toyota's 2011 Camry. Mr. Syson's education, training and experience encompass almost all aspects of automobile design and engineering, including accident investigation and reconstruction, vehicle crashworthiness, and the study and evaluation of passenger restraint systems. He has reviewed and analyzed the information available to him, prepared Reports with his findings, and appeared for a full day of deposition. Mr. Syson's Report of July 14, 2014 is attached as Exhibit 1 to this Response, and is

incorporated herein. His Report of November 21, 2014 is attached to this Response as Exhibit 2. His Affidavit of January 13, 2015 is attached to this Response as Exhibit 3.

Mr. Syson's opinions, as found in his reports, affidavits and testimony, together with the data and information that he relied upon, provide support for each element of Plaintiff's claims for design defect, negligence and breach of implied warranty. Liability for personal injuries caused by a product's defective design can be imposed under several legal theories, among then negligence, breach of warranty and strict products liability. *Hyundai Motor Co. v. Rodriguez ex. Rel. Rodriguez*, 995 S. W. 2d. 661, 664 (Tex. 1999). Plaintiff has asserted these claims. Toyota, however, has not met its burden of showing that there is an absence of evidence to support any particular element of Plaintiff's claims, essentially repeating its general position that Plaintiff does not have expert testimony to support her claims.

Toyota's approach in its MSJ is to ask the Court to disregard Mr. Syson's opinions and testimony, followed by a statement that Plaintiff does not have expert support for her claims. In fact, Toyota's MSJ is yet *another* attempt to ask the Court to strike Mr. Syson's opinions and testimony. However, Toyota has already launched that battle and lost. Toyota filed its Motion to Strike the Testimony of Plaintiff's Expert Stephen Syson on January 9, 2015. *Doc. No. 61*. The Court, despite Toyota's urgings, rightly refused to strike the testimony of Mr. Syson. *Doc. No. 57*. Essentially, Toyota simply is attempting to re-urge its Motion to Strike under the guise of its Supplement. In fact, Toyota asks the Court to "disregard" or "exclude" Mr. Syson's testimony at least four times. *See Supplement at pp. 2, 9, 10, and 11*. Clearly, Toyota understands that it must persuade the Court to disregard or exclude Mr. Syson's testimony in order to obtain a summary judgment. The Court already has refused to do that, so it should in turn deny Toyota's MSJ.

1.  Toyota's claim that expert testimony is required

In its Motion, Toyota lists a number of cases for the proposition that expert testimony is necessary for Plaintiff to prove her design defect claims. However, the cases that Toyota cites primarily are cases involving a manufacturing defect, rather than a design defect. *Motion, pp.4-5*. Even in these manufacturing defect cases, however, courts do not hold that expert testimony is an absolute requirement in every case, using phrasing such as "if general experience and

common sense do not enable a fair understanding of causation under the circumstances….” and "expert testimony is generally encouraged…" *See*, as cited by Toyota, *Prator v. Ford Motor Co., 97 S.W. 3d 237, 241* (Tex. App. ---Houston [14[th] Dist.] 2002, no pet.) and *Mack Trucks, Inc. v. Tamez, 206 S.W.3d 572, 583* (Tex. 2006). Courts clearly will defer to the general experience and common sense of the jury when possible.

Nor is there a requirement that every plaintiff hire a full stable of every conceivable expert in every case. For example, while expert testimony under some circumstances might be helpful, it is not required to establish causation "[w]hen a layperson's common understanding and general experience enable her to determine, with reasonable probability, the causal relationship between the event and the condition. . . ." *Farrar v. Sabine Mgmt. Corp., 362 S.W.3d 694, 703-704* (Tex. App. Houston 1st Dist. 2011), citing *Towers of Town Lake Condo. Ass'n, Inc. v. Rouhani*, 296 S.W.3d 290, 298-99 (Tex. App.—Austin 2009, pet. denied). Even without Mr. Syson's testimony, the testimony from Plaintiff, Valerie Hicks (the driver of the vehicle), and other eyewitnesses constitutes evidence of causation. *See id.; See also Exhibits 7-10, deposition testimony.* Their testimony alone raises a question of material fact as to whether Toyota's actions caused the accident and Plaintiff's injuries. *Id.*

There also is not a need for a separate reconstructionist or biomechanical engineer in this matter. A reconstructionist, or the resulting reconstruction, is not necessary in a case like this one, where the vehicle is unavailable and the claim is based on a defective design, not a manufacturing defect. In addition, Mr. Syson has developed opinions about the accident and Toyota's liability without creating his own reconstruction. Whether an expert has done his own accident reconstruction may go to the weight of the testimony, but does not automatically disqualify him from testifying as an expert. *Medina v. Daimler Trucks N. Am., LLC*, 2014 U.S. Dist. LEXIS 178419, 10-11 (D.N.J. Dec. 30, 2014*), citing to See e.g., United States v. Arias*, 678 F.2d 1202, 1206 (4th Cir.1982), *cert. denied*, 459 U.S. 910, 103 S. Ct. 218, 74 L. Ed. 2d 173 (1982) ("This does not mean that an expert must rely solely on his own work, but he can rely on another's information or work, if it is of the type normally relied upon by an expert in the course of his work."); *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002) (explaining that an expert may apply the results of another expert's calculations, if a proper foundation is laid.) Federal Rule of Evidence 703 states that an expert may formulate an opinion based on facts or data that he or she did not personally observe: "An expert may base an opinion

on facts or data in the case that the expert has been made aware of or personally observed." *Fed. R. Evid. 703*. The Rule's Advisory Committee explained that one of the possible sources of "facts or data" an expert may rely on to form his or her opinion is data gathered "outside of court and other than by his [or her] own perception." *Medina at 613*; *Fed. R. Evid. 703, Advisory Committee Notes*. Similarly, the testimony from a separate biomechanical engineer is not necessary for Plaintiff to prove her case because the testimony of Plaintiff, the eyewitnesses, the driver, Plaintiff's treating physicians, and Mr. Syson, are sufficient to raise a fact issue which should be presented to the jury.

In any event, Plaintiff does, in fact, have an experienced and highly respected expert to support her claims. Mr. Syson will testify about Toyota's defective 2011 Toyota Camry, including its defective design, the ways in which it is unreasonably dangerous, safer alternatives, and the manner in which the defects relate to Plaintiff's injuries.

## 2. Plaintiff's expert is highly qualified to give his opinions

In its Supplement, Toyota calls Mr. Syson "unreliable." *Supplement at 2*. That accusation is preposterous, and of course Toyota provides no support for such a statement. Mr. Syson's Reports detail his extensive expertise and experience. Mr. Syson is eminently qualified in the area in which he is offering his opinion in this case, qualifying by knowledge, skill, experience, training, and education. Among the highlights:

- Bachelor's degree in Mechanical Engineering from General Motors' Institute (GMI) and a Master's degree in Engineering from Case Western Reserve University in 1970.
- Mr. Syson was employed at General Motors Design Staff as a Research Engineer from August 1969 through February of 1971.
- In February of 1971, Mr. Syson transferred to the Safety Research and Development Laboratory at the General Motors Proving Grounds. He worked at the Proving Grounds through August 1978 as an engineer in the restraints, structures and analytical groups., where, among other things, he was responsible for analyzing the crash test, sled test and field accident performance of restraint systems on GM vehicles.

- Mr. Syson was with MCR Technology (formerly Minicars) an engineer and manager for approximately four years, and was head of both the engineering and design groups.. While at MCR, he was involved in several government contract programs to develop vehicles for improved crashworthiness, including research safety and modified integrated vehicle programs. This work involved vehicle crash testing and evaluation of occupant restraint system performance.

- In 1982, Mr. Syson and his partner formed Syson - Hille and Associates. Since 2009, he has been Chief Engineering Officer of The Syson Corporation.

- Mr. Syson is a member of the Society of Automotive Engineers (SAE), a former member of the SAE Impact Simulation Sub-Committee, and a member of the American Academy of Forensic Sciences and American Society of Mechanical Engineers.

- Mr. Syson has been qualified as an expert witness in numerous federal and state courts around the United States on issues of accident reconstruction, vehicle crashworthiness, occupant protection and restraint system design, testing and performance.

- Mr. Syson has studied and testified about Toyota's vehicles in other proceedings.

*Exhibits 1, 2 and 3.*

Mr. Syson has over forty years of education, training and experience in the field of automotive engineering, which includes accident investigation and reconstruction, vehicle crashworthiness and the study and evaluation of passenger restraint systems and occupant protection in passenger vehicles. He is familiar with both the manufacturing and design of General Motors' automobiles and light duty trucks, and those of numerous other manufacturers including Toyota. *Id.* Even Toyota admitted that "Syson has been studying vehicles for over 50 years…He has been testifying in automobile product liability cases for numerous years." *Supplement at 9.*

3. Plaintiff's Original Complaint sets forth the allegations to support Mr. Syson's opinions.

Toyota continues to refer to Mr. Syson's Reports as "untimely," even though the Court already ruled that Mr. Syson may testify as to "the allegations as set forth in the Original Complaint." *Doc. No. 57. Nothing* about the Court's Order rejects Mr. Syson's testimony based on the timing of any of his reports, opinions or testimony. Instead, the Court stated that Mr.

Syson may testify about those matters raised in the Complaint. Toyota argues that this must mean that the Court intended to reject some of Mr. Syson's testimony, including his November 21, 2014 Report; to the contrary, the Court's Order would permit *all* of Mr. Syson's testimony if it fits the criteria set forth in the Order.

The allegations set forth in Plaintiff's Original Complaint *do* include the information and theories upon which Mr. Syson relies. The Original Complaint specifically states that "the defective design of the *front passenger side* of the 2011 Toyota Camry" and the "significant failures of the design of the 2011 Toyota Camry" caused Plaintiff to suffer "a fracture of the upper end of her tibia…as well as numerous other injuries." *See Original Complaint, Doc. No. 1, emphasis added*. Among other assertions, the Original Complaint further states:

- "Defendants recklessly and negligently designed the Toyota Camry in a manner that placed the front seat passenger in danger. The design of the 2011 Toyota Camry failed to protect Plaintiff from severe, debilitating and permanent injuries and losses. Defendants knew or should have known of the dangers to the front seat passenger in its 2011 Toyota Camry through its own testing of the vehicle, and through the testing of government and industry agencies." *Id. at 2-3*.

- "In 2011, the National Highway Traffic Safety Administration ("NHTSA") issued the results of its testing of Toyota's 2011 Camry. These results were significant, particularly for a female passenger in the front passenger seat. In sum, the NHTSA testing demonstrated that a female in the front passenger seat of the 2011 Toyota Camry was not safe in the case of a front or side crash." *Id. at 4-5*.

- "Defendants' negligence and recklessness in designing and testing, and failing to redesign, recall, warn, and/or take appropriate action regarding 2011 Toyota Camry has compromised the safety of the driver and front seat passengers, and directly caused the injuries and damages suffered by Plaintiff." *Id. at 5*.

- "Plaintiff was taken by ambulance to Medical Center Hospital in Odessa, Texas, where she was placed in the Intensive Care Unit. Her medical care, surgeries, and rehabilitation continued over a six month period, and still are not complete. She was diagnosed with a fracture of the upper end of her tibia, for which she underwent surgeries for the insertion and adjustment of an internal orthopedic device, as well as numerous other injuries, as a result of the collision caused by Toyota's defective design

of the 2011 Camry.  Her gait and walking capabilities have not been, and cannot be, fully restored." *Id. at 6-7.*

These allegations of defective design certainly encompass the design defects in Mr. Syson's opinions, including those relating to the passenger compartment protections, seat restraints, knee airbags, and submarining, since these clearly are design elements of the "front passenger side of the 2011 Toyota Camry."   Consequently, Toyota simply is incorrect.

### 4.  Mr. Syson's opinions as to Toyota's design defect are numerous and well founded.

Mr. Sysons has come to many conclusions regarding Toyota's wrongful acts.  A selection:

- "The Camry structure violates two of the basic principles o f crashworthiness:    1. The structure failed to appropriately manage the collision energy, since, as shown below, the bumper was not designed to feed loads from the area outboard the main unibody rails into those rails, and the wheel, tire and suspension were not designed to deflect the striking vehicle around the compartment in an offset frontal collision. 2. Because the front of the Toyota did not interface with the front of the Sebring properly, the front of the Sebring bypassed the main Camry front unibody rail. Part of the design problem with the Toyota is the inadequate width of the bumper reinforcement. The bumper reinforcement barely extends outboard of the main unibody rail, and has access holes that weaken it, where it needs to be reinforced."  *Exhibit 1 at 9-10.*

- "Mrs. Samuell's injuries were a result of the failure of the safety belt to appropriately restrain both her pelvis and torso, combined with the excessive occupant compartment deformation." *Exhibit 1 at 10*.

- "In 2011, Toyota clearly knew that side airbags should deploy in collisions, such as the Hicks/Samuell crash, since almost all Toyota side airbags deployed in recent IIHS offset crash tests, including those conducted by Toyota. (2011 Scion TC, 2010 Tundra, 2012 Camry, 2009 Corolla, 2011 Sienna) Toyota either failed to consider that US vehicles can strike the passenger's side as well as the driver's, or failed to properly design the side airbag sensors for offset oblique crashes." *Exhibit 1 at 14*.

- "Toyota chose to use an unsafe front structure for the 2011 Camry." *Exhibit 1 at 15.*

- "The ·2011 Camry structures and restraint systems resulted in acceptable NCAP results, with a significant margin in injury criteria, provided the airbags deployed promptly and the crash loads were distributed evenly across the front of the ·car. The Hicks collision, as well as many other low-overlap/oblique offset collisions, illustrates that Toyota designs to the test, and not to protect occupants in the real world." *Id.*

- "Toyota failed to use any safer alternative designs, which would have rendered the front structure reasonably safe." *Id.*

- "Toyota failed to design the sensing system for the side airbags so that the side airbags would deploy and protect the occupant's head in collisions that exceed the capacity of the A pillar padding to provide head protection." *Id.*

- "Toyota failed to properly analyze existing frontal crash test data and field accident databases that demonstrates the ineffectiveness of the 2011 Camry front structure and other similar designs .in low overlap frontal offset collisions." *Exhibit 1 at 16.*

- "Toyota failed to conduct appropriate safety systems analysis… of its restraint system and front structure design including but not limited to:

  o Failure Mode and Effects Analysis

  o Design Failure Mode Analysis.

  o Fault Tree Analysis

  o Risk Hazard and Danger Analysis

  o Root Cause Analysis

  o Identification of potential risks, hazards and dangers." *Id.*

- "The failure to properly test and to conduct proper engineering analysis leads to design defects that can harm and kill people using a product in a foreseeable manner." *Id.*

- "In both test reports, the post-test photographs show the test dummy substantially lower in the seat after the collision, consistent with submarining. Attachment 2 shows the slouched right front dummy in the 2010 Camry. Submarining with a test dummy is particularly disturbing since test dummies are less likely to submarine than real people. (Couturier, 2007)" *Exhibit 2 at 6.*

- "I have recently been provided a number of Toyota crash tests. Toyota indicates that the crash tests of 2007 model year Camry vehicles validate the 2011 performance. In the 2007 Camry 35 MPH frontal barrier crash test with a 5%tile female crash test dummy, the dummy also submarines." *Id.*

- "The lack of anti-submarining features in the subject Camry RF seat caused Ms. Samuell's belt to move off her pelvis, just as it did in the three referenced crash tests." Id.

- "Any seat and/or safety belt that produced submarining with a test dummy was unreasonably dangerous and defective. Submarining is readily prevented with proper seat and safety belt design, as Dr. Adomeit describes in the references to my prior report. (Aqomeit, 1975 and 1979) Toyota clearly is aware of anti-submarining seats, since there was a welded-on anti-submarining ramp used on the 2001 Toyota Sienna minivan, which is based on the Camry platform*." Exhibit 2 at 7.*

- "Passenger's side knee airbags have been technologically feasible since 1973, when they were used on the GM Field Trial Program Chevrolets. Knee airbags have been used on the passenger's side of cars in mass production intermittently since the 1975 model year. A knee airbag, bolster or anti-submarining seat would also have reduced the loads on Ms. Samuell's legs, since they would have slowed her pelvis sooner allowing her to "ride down" the crash." *Exhibit 2 at 8.*

- "Beginning with the 2012 model year, the Scion iQ and Toyota Yaris have seat cushion airbags for the driver and front passenger as standard features. The front of the seat cushion inflates in a frontal crash. The seat cushion inflates, lifting the occupant's knees upward, to make the safety belt fit better and to reduce submarining of the occupant's pelvis below the safety belt by supporting the occupant's knees." *Id.*

- "Anti-submarining seat cushion airbags had been available in Europe in Renault vehicles for at least four years when the subject Camry was manufactured. They were a technologically feasible safer alternative design for a vehicle with a known risk of

submarining in crash tests like the Camry." *Id.*

- "Camry platform structures do not perform well in head-on offset and oblique offset vehicle-to-vehicle collisions. I have investigated several such collisions, and the crash partner occupants, like the driver of the Sebring in this collision, have been less seriously injured. Only in the IIHS Camry to Yaris test does the Camry test dummy occupant do better than the dummy in the crash partner, which is a smaller Toyota with similar structural problems to the Camry. As I explained in my previous report, Toyota did not fix the Camry structure until mid 2014. However, all of the structural changes made to the mid 2014 Camry were technologically feasible and most were in use decades ago, as I noted in my prior report." *Id.*

Mr. Syson's opinions clearly are relevant, support Plaintiff's claims, and will be a valuable resource to the jury.

<u>5. Mr. Syson's opinions as to safer alternative designs are well researched and the result of years of experience.</u>

a. <u>Mr. Syson's use of testing</u>

Toyota devotes one paragraph on p. 11 of its Supplement to state, without support, that Mr. Syson has done no testing or analysis of his proposed alternative designs. Nothing could be further from the truth. In this case, Mr. Syson relied upon testing from vehicle manufacturers around the world for a 40-year period to determine that the 2011 Toyota Camry was defective. *Syson Affidavit, Exhibit 3 at 3; see also Syson's Reports, Exhibits 1 and 2*. Mr. Syson also relied upon testing by the IIHS, NHTSA, and Australian and European New Car Assessment Programs to determine the engineering validity of his opinions. And perhaps most compelling is the fact that *the tests supplied by Toyota during the discovery process also support his opinions. Id*.

Further, Mr. Syson relied upon his own frontal offset test experience from his work at General Motors and Minicars to insure that his opinions in this case were reliable, including offset crash tests conducted for the GM ACRS program and the Minicars RSV program. Moreover, Mr. Syson designed the RSV structural modifications and worked with the airbag sensor designers to provide a specific crash sensor location for car-to-RSV frontal collisions, including offset and oblique collisions. *Id.*

Mr. Syson's opinions in this matter are not novel, unique or new. In fact, his opinions *are identical to the conclusions that Toyota drew once Toyota studied the same crashworthiness issues*. *Id*. His findings also parallel the findings and conclusions of the material that he relied upon, some of which dates back over 40 years. None of his opinions are based on subjective belief, but rather each of them are based on over 40 years of testing, peer reviewed material, research and data compilation. *Exhibit 3 at 6.*

Mr. Syson's use of existing testing as the basis of some of his opinions is perfectly appropriate. Courts have held that an expert may *review* testing of his proposed safer alternative design. *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 991-993 (5th Cir. 1997) Nor is testing required in every case; the *Watkins* court stated that testing may not even be necessary at all in certain cases. *Id. See also Fed. R. Evid. 703*.

Mr. Syson based his opinions regarding the alternative design on actual IIHS crash testing of the alternative design. Specifically, Syson provided images and analysis from the IIHS small overlap crash tests, which revealed that "the substantially similar 2012 Camry results in more passenger compartment damage and slightly less front-end damage when compared to subject Camry." *Exhibit 2 at 2.* Mr. Syson also provided crash test analysis of the 2009 Toyota Yaris, providing that "The 2009 Camry is the same platform as subject 2011 Camry, and the damage to the crash test 2009 Camry was substantially similar to a mirror image of the damage to the subject 2011 Camry." *Id*. Finally, Mr. Syson also provided testing analysis and images from the NHTSA oblique offset crash testing on a 2012 Camry stating, "The damage was a virtual mirror-image of the Samuell vehicle." *Id*. at 3.

Moreover, Mr. Syson has shown that a safer alternative design has been available to Toyota since the 1970's, yet Toyota chose not to implement the safer alternative.[1] *Exhibit 1* at 12. In even further support, Mr. Syson explains that the alternative design was adopted by Nissan back in 2003, and provided an example revealing how much better a substantially similar vehicle performed with this type of crash. *Id*. Consistent with the case law, Mr. Syson has provided the Court with evidence of an alternative design, and based his opinions on multiple crash tests substantiating his position.

---

[1] "The 1970's Toyota ESV had an advanced structure, designed to perform well in offset frontal crashes. But, an appropriately designed front structure was not used on the subject Camry, almost 40 years later." *Syson July 14, 2014 Expert Report* at 12.

Mr. Syson is extremely qualified in this field, and abundant testing of his proposed alternative for the 2011 Toyota Camry has been extensively tested throughout by manufacturers, the auto industry, and even Toyota itself. These tests, well known to and thoroughly reviewed and analyzed by Mr. Syson, coupled with Mr. Syson's personal experience and training, form the foundation of his opinions.

        b.      <u>Mr. Syson's proposed safer alternatives were tested by Toyota</u>

Mr. Syson had no need to conduct a "litigation" test in this case, since Toyota itself and the IIHS had already tested the type of modifications that he recommended for the Camry at issue in this case. *Exhibit 3, Syson Affidavit at at 3; see also Syson Reports, Exhibits 1 and 2.* Mr. Syson also has had 40 years of testing, engineering analysis, peer reviewed papers, studies and data compilation on which to base his safer alternative design opinions. For example, in 1979, he used virtually the same techniques to reinforce the front structure of the LRSV, in order to minimize compartment deformation in offset and oblique collisions. *Id.* These techniques included longitudinal members running under the occupant compartment to support the front unibody rails, and a tubular upper door reinforcement to support the loads from the upper unibody rail. *Id.* Furthermore, Nissan developed the same type of structural modifications for their cars in 2003. *Exhibit 3 at 4.* As described in the Syson Affidavit, the Saeki paper[2] describes reinforcement techniques, virtually identical to those that Mr. Syson proposed. *Id.*; *Exhibits 1 and 2*. Mr. Syson points out that Mr. Saeki indicated that an offset oblique collision is more severe than either an offset or an oblique crash. The Saeki paper shows that the structural modifications that Mr. Syson recommended for the Toyota Camry work in testing by reducing compartment deformation. *Id.*

Mr. Syson's proposed safer alternatives also are economically feasible. Although Toyota has not directed its MSJ to this point specifically, relying instead on general statements that Plaintiff does not have an expert to testify on its claims, Mr. Syson has demonstrated that his proposed safer alternatives are economically feasible, and have been tested and used in the industry. *Exhibits 1 and 2.* . In fact, Mr. Syson points out that the alternative design was adopted

---

[2] Saeki, H., et al, "A FUNDAMENTAL STUDY OF FRONTAL OBLIQUE OFFSET IMPACTS," NISSAN MOTOR CO., LTD., Paper Number 264, 18th International ESV Conference, 2003.

by Nissan back in 2003, and provided an example revealing how much better a substantially similar vehicle performed with this type of crash. *Exhibit 1 at 12.*

        c.      <u>Mr. Syson's opinions, well supported by objective data, show that Toyota knew its design for the 2011 Camry was defective, and used it anyway.</u>

Mr. Syson's opinions and conclusions are not created from whole cloth, or somehow without sound basis. In fact, Mr. Syson based his analysis of the frontal offset design defects and safer alternative designs on testing conducted by the IIHS, NHTSA, Australian ANCAP, and European NCAP. *Syson Affidavit, Exhibit 3 at 4; see also Syson Reports, Exhibits 1 and 2.* He also relied upon ESV testing and data compilation starting back in 1971 from GM, Ford, Chrysler, Minicars, Toyota, Nissan, Mercedes Benz, Volvo, BMW, VW, Fiat, Peugeot and Renault. *Id.*

Further, Mr. Syson relied upon peer reviewed papers dating back to the 1960's that discuss test protocols, design modifications, safety enhancements and crashworthiness considerations that were factored into making vehicles more crashworthy in frontal offset and offset oblique collisions. Several of these papers were written by engineers from Nissan, Honda, numerous European manufacturers, *as well as Toyota itself. Id.* These papers explain how to build front structures to provide occupant safety during frontal offset impacts, and offset oblique collisions, where the loads were focused on one side of the vehicle structure. *Id.* Then, Mr. Syson applied his own knowledge of frontal offset testing and design considerations that he learned while working at GMC and Minicars to the facts of this case. *Id.*

Mr. Syson also addressed frontal offset structure design characteristics in numerous places in his Reports. He also cited *dozens of crash tests demonstrating the deficiencies in the Camry and sister Lexus ES vehicles, and provided the results of other real-world crashes where these structures failed. Exhibit 3 at 5.* He further showed that the techniques used to reinforce the 2014 Toyota Camry and improve its performance in the narrow overlap IIHS testing were used by Volvo and Honda prior to the 2011 Toyota Camry model year. *Id.* Further, upon extensive questioning by Toyota's counsel, he addressed frontal offset structure design in numerous places throughout his deposition. *Id.* In that deposition, and in his reports, Mr. Syson cited numerous papers that demonstrate that successful oblique and offset structural designs have

used selected techniques from the structural modifications that he recommends in this matter. *Exhibit 3*.

Mr. Syson relied on documents from Toyota about its notice back in 1997 that it was conducting small overlap car-to-car partial frontal impacts. Mr. Syson further relied on the engineering peer reviewed offset articles, data compilations and frontal testing. Based on the fact that Toyota was able to quickly modify the Camry to provide dramatic improvement in occupant protection in the IIHS narrow overlap test, Mr. Syson was able to conclude that Toyota possessed the engineering capability to make the 2011 Toyota Camry safe, but chose not to. *Exhibit 3 at 5*.

Regarding Toyota's own crash tests, Mr. Syson states: "Toyota indicates that the crash tests of 2007 model year Camry vehicles validate the 2011 performance. In the 2007 Camry 35 MPH frontal barrier crash tests with a 5%tile female crash test dummy, the dummy also submarines…The 2007 Camry right front passenger's seat has no significant anti-submarining features…The lack of anti-submarining features in the subject Camry RF seat caused Ms. Samuell's belt to move off the pelvis, just as it did in the three referenced crash tests*." Exhibit 2, Syson November 21 Report*.

Mr. Syson will testify, based on the facts and data included in his reports and deposition, that Toyota knew for decades how to design its vehicles to perform safely in the most frequent impact mode based on the Toyota ESV and Toyota's own internal documents. *Id.* Toyota's failure to conduct narrow overlap testing on the Camry, while doing so on the Premio, for example, exposed people to the risk, hazard and danger of serious injury, including death. *Exhibit 3 at 6*.

Mr. Syson will testify, again based on demonstrable and reliable facts, that Toyota failed to conduct the necessary engineering analyses such as FMEA, DFMA, Fault-tree analysis or risk hazard analysis on the risks, hazards and dangers associated with frontal offset impacts and oblique collisions with offset. His professional opinion is that "when proper testing and engineering analysis has not been conducted, defectively designed vehicles enter the stream of commerce. These are the reasons the 2011 Toyota Camry was defective from a structural integrity standpoint. This is engineering 101, not some novel theory created solely for litigation.

In fact, Mercedes-Benz developed safer alternative designs for these crashes in the 1980's. Toyota was just 30 years late in applying safer technologies to the Camry." *Id.* In not responding to poor testing results, and in not implementing what it knew to be a safer and better design, Toyota proceeded with a conscious indifference to the rights, safety and welfare of others, particularly front seat passengers in its 2011 Toyota Camry.

6. Toyota's design defects relate directly to Plaintiff's accident and injuries

Toyota has not specifically objected to or directed the court to the issue of how Toyota's design defect related to Plaintiff's accident and injuries. This is a failure of Toyota to meet its initial burden in its MSJ. Just so that there is no confusion, however, Mr. Syson has opined that "failure of the Camry's safety systems caused the Mrs. Samuell's injuries to be so serious." *Exhibit 1 at 9.* He relates Toyota's design defects to Plaintiff's injuries throughout his reports. *Exhibits 1 and 2.*

7. Gross Negligence and Exemplary Damages

Under Tex. Civ. Prac. & Rem. Code Section 41.003 (a), a Plaintiff is authorized to receive exemplary damages when the harm results from fraud, malice or gross negligence. Plaintiff has shown, in the sections above, that Toyota had actual subjective awareness of the extreme risks of its design of the 2001 Camry as they relate to the passenger compartment. In not responding to poor testing results, and in not implementing what it knew to be a safer and better design, Toyota proceeded with a conscious indifference to the rights, safety and welfare of others, particularly front seat passengers in its 2011 Toyota Camry. *Tex. Civ. Prac. & Rem. Code 41.001(11).* Mr. Syson has testified, and included in his Reports, the facts supporting gross negligence and exemplary damages. At the very least, these are facts and decisions for the jury as the trier of fact.

8. Toyota is not entitled to summary judgment on Plaintiff's claims.

Mr. Syson's Reports, testimony, and affidavits all provide his expert opinions about the 2011 Toyota Camry, and the ways that the design, testing, and structure of the vehicle caused and contributed to Plaintiff's injuries. Mr. Syson provides opinions and support for each of

Plaintiff's claims, including those for design defects, marketing defects, negligence. And breach of implied warranty. The materials attached to this Response certainty raise a genuine dispute of material fact, and frankly go even further to fully support Plaintiff's claims.

Since there is a genuine issue of fact, as well as expert support, on each element of each of Plaintiff's claims, the requirements of summary judgment under FRCP 56 have not been met by Defendants. Consequently, Defendants' Motion for Summary Judgment should be denied as a matter of law. [3]

### F.  Toyota's unrelated and unprofessional attacks on Plaintiff

Toyota spends the first 7 of the 15 pages of its Supplement attacking Plaintiff and her counsel over matters that are not related in any way whatsoever to Toyota's MSJ.  In fact, the 7 page *ad hominem* attack does not discuss the elements of Plaintiff's case or Toyota's defense; it does not claim that there are no fact issues (as one would assume to find in a defendant's motion for summary judgment); it does not claim that Toyota is entitled to summary judgment as a matter of law. Rather, Toyota simply flails away at Plaintiff's counsel.  Toyota accuses counsel of misrepresentations and untrue statements, calls her "disingenuous," and accuses her of "manipulation" and "ruse." *See Toyota's Supplement, pp.1-7*. Apparently, Toyota has lost its temper because the Court realized that Plaintiff did, in fact, have expert testimony to support her claims, and that administrative and procedural matters do no take precedent over merit and a plaintiff's right to present her case before a jury.

Once Toyota's accusatory and inflammatory language is set aside as not material, Toyota seems to have two complaints in this entire 7 page section:  First, that Plaintiff decided not to take the deposition of Toyota's corporate representative----a deposition which Toyota had fought with huge effort and expense to avoid or narrow, including through a motion to quash and voluminous objections.   The second complaint is that Plaintiff made the strategy decision not to take the depositions of the three Toyota expert witnesses.  Plaintiff is not certain the reason Toyota feels it has standing to object to these decisions, particularly when the outcome of these

---

[3] Based upon her investigation and discovery, Plaintiff is no longer making a claim based upon a manufacturing defect.  Plaintiff has never made a wrongful death claim based on the death of Durward Watts.

decisions (no depositions) is something that Toyota heavily strove to accomplish. Perhaps Toyota wanted to have its expert testimony preserved for trial at Plaintiff's expense? In any case, all of this has nothing to do with the merit, or lack of merit, of Toyota's MSJ. Plaintiff asks that the Court strike these statements, and disregard them.

Although it has nothing to do with the merits, Plaintiff will nevertheless briefly address Toyota's accusations so that the record is not unclear. At the time of the hearing on September 3, 2014, Plaintiff fully intended to take the deposition or depositions of Toyota's 30(b)(6) corporate representatives and the expert witnesses designated by Toyota. Since that time, however, Plaintiff's case strategies have evolved, and decisions regarding these depositions changed. Discovery and trial strategies are organic, and can develop, change, and even dramatically reverse direction throughout the course of a lawsuit.

During September and October 2014, Plaintiff worked with Toyota's counsel to obtain dates and times for the deposition of the corporate representative of Toyota Motor Corporation ("TMC") In preparation for the deposition, it came to Plaintiff's attention how significantly limited the subject matter of the deposition would be, based on the extensive and obstructive responses made by Toyota to Plaintiff's document requests and Notice of 30(b)(6) Depositions. *See Toyota Motor Corporation's Response to Plaintiff's Notice of FRCP 30(b)(6) Notice of Deposition of Corporate Representative of Toyota Motor Corporation* and *Toyota Motor Corporation's Response to Plaintiff Charlotte Samuell's Request for Production of Documents, attached as Exhibits 5 and 6.*

In view of the exceedingly restricted scope of the deposition due to TMC's Response to Plaintiff's 30(b)(6) and TMC's Reponses to Plaintiff's Request for Production, Plaintiff came to understand that the corporate representative deposition would be of little actual value. Rather than providing the relevant and valuable information that Plaintiff originally hoped to obtain from the corporate representative, including explanations as to the design and testing of the 2011 Toyota Camry and other related vehicles, Toyota's intent and knowledge concerning the defects in the Toyota 2011 Camry, and information about the documents that the Toyota Defendants had produced or would produce, it appeared that the deposition would not be productive in the way Plaintiff originally had hoped.

In addition, the strategies for the prosecution of this case evolved over the next several months after the September hearing, including the manner in which Plaintiff would prove her claims, present her case to the jury, file any responses to substantive motions, and cross examine any Toyota witnesses. Based on all of these factors, it was decided not to go forward with the deposition of TMC's corporate representative.

Although dates were obtained for the depositions of Toyota's designated expert witnesses, Plaintiff's strategy for the trial, and her approach to her response to Toyota's Motion for Summary Judgment, developed further. It was determined, after further analysis of their reports, that these alleged experts would not have information that would be necessary for Plaintiff's response to Toyota's Motion. Finally, as preparation continued, it became apparent that Toyota's three expert reports contain what Plaintiff believes to be numerous inconsistencies. Rather than allowing Toyota to "clean up" these clear inconsistencies after its experts were deposed, the strategic decision was made to cross examine these experts live at the time of trial. Nothing about this strategic decision is improper or even uncommon. Based on these factors, it was decided that Plaintiff would not go forward with the depositions of Toyota's alleged experts.

### Prayer

Wherefore, Plaintiff requests that:

- The Court strike and disregard the statements in Toyota's Supplement to Motion for Summary Judgment on pages 1-7;
- The Court deny Defendants' Motion for Summary Judgment and Supplement to Motion for Summary Judgment, and
- The Court award Plaintiff all relief, at law or in equity, to which she may be entitled.

Respectfully submitted,

 /s/ Steve Sumner
Steve Sumner
Texas State Bar #19508500
E-Mail: ssumner@sumnerschick.com
Gayle A. Boone

Texas State Bar #02628500
E-Mail: gayleboone@sumnerschick.com
Sumner, Schick & Pace, L.L.P.
3811 Turtle Creek Blvd., Suite 600
Dallas, Texas 75219
(214) 965-9229 – telephone
(214) 965-9215 – facsimile

**ATTORNEYS FOR
CHARLOTTE SAMUELL, PLAINTIFF**


## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served on Defendant's counsel in accordance with the Federal Rules of Civil Procedure by the method indicated below.

***Via Email: brian.mason@bowmanandbrooke.com***

Brian E. Mason
Bowman and Brooke LLP
2501 North Harwood Street, Suite 1700
Dallas, Texas 75201


_/s/ Gayle A. Boone_____
                Gayle A. Boone